Take your time in getting set up. Our last case this morning is number 22-10881, Douglas Staley v. Warden et al. Mr. Leach. Good morning, Your Honors. Martin Leach on behalf of the appellant here today. Jose Villegas, who was an inmate at Lake CI, passed away under tragic circumstances on March 28, 2017. This case is on appeal from a summary judgment that was entered after a 42-page report and recommendation was done by the magistrate judge that was rejected in toto by the district court judge in the district court judge's review of the case. Around my office, we refer to this as the DeMar Hamlin case. He's the football player who collapsed on the field in Cincinnati. A bunch of medical personnel trainers came out, were able to revive him on the field, took immediate action, didn't get a wheelchair and slowly rolled him under the stadium where there might have been a better medical facility in which to care for him. They were last week awarded an ESPY award as a result of their immediate action at that time. If instead of doing what they'd done, they had rolled him slowly in a wheelchair away, he probably would have died and the 60,000 or 70,000 fans who were there in Cincinnati probably would have been booing and saying, this is criminal recklessness. This is criminal recklessness. So, counsel, I guess your argument is that failure to respond with a team of paramedics and AED and do immediate medical attention in the center of the field, the center of wherever he is, is deliberate indifference. Anything short of the Hamlin experience? Well, that's a dramatization to explain what we have here. We have a situation where- No, no, no, it isn't. We don't have a team of paramedics standing by and we don't have someone who suddenly collapses without any violent outburst or anything like that. We don't have trained specialists. We don't have an AED at hand or anything like that. Why don't you stick to these facts and tell us why under these facts, regardless of how you refer to it in your office, there was deliberate indifference clearly established to be deliberate indifference? Absolutely, Your Honor. There are two videotapes that show this incident. There's one that's in the main room, it's eye in the sky one, shows everything from the very beginning, from when the guards are originally going around checking on the inmates who are in their cells at the time. I know that's a part of the record. I hope the court has had a chance to review the videotapes because there's two of them. The eye in the sky one shows what happens. The officers first go in. They observe that something is not right. You can't tell what it is, but they testified that they see an unresponsive inmate on his face, on his back. You can see, Mr. Leach, in that video that once the corrections officer sees your client who is passed out in the cellmate floor, he calls out to the second corrections officer who's on the second floor, who immediately proceeds to run and run down the stairs. Then they have to take out the cellmate. They have to handcuff him, make sure that he is restrained and sitting down, and then they have to go get additional people, and additional people start coming. So exactly how is it that the officers in this case acted with deliberate indifference when you can see from the moment that the video starts that once they see that there is a situation, they immediately move to respond? As soon as they see what's going on, they immediately respond. That is correct. They follow procedure. They call immediately for the nurses to come. You can see the nurses come with the wheelchair, with the red box, with the AED, the defibrillator. They had the defibrillator on them in the e-dorm. It's on the wheelchair. Both nurses testified that the defibrillator was there. The CPR equipment was there. The red box was there. All the equipment they would need, all the equipment that trainers would have running onto the field to save a football player would have were right there in the wheelchair. So what happens is the two nurses come. You can see first Nurse Fisher came. She's standing there, and about a minute or so later, perhaps it was a little more than a minute, but very shortly after that, Nurse Spencer comes. They're back. The inmate's still in the cell, and they're sitting there kind of talking, watching right next to the wheelchair, and then they bring him out into the main room. At that point, they have roused him because, as I said, he was unresponsive on the floor, on his stomach, excuse me, on his back, and that would constitute a medical emergency, which is why they got on there and brought the nurses there. That's why the nurses were there. I think that's your strongest argument. I think the strongest argument on your side of the case is that this was not a situation where the corrections officers were just dealing with things on their own without any medical professionals there. They had the two nurses from the beginning, and even if they weren't deliberately indifferent in not letting the nurses check him immediately during the first 20-something minutes, at the very end, when the nurse tried to intervene, she was told to back away, and she couldn't even take his pulse. That to me is the strongest argument you have, and I think it's the strongest argument because although the district court mentioned the nurses in the statement of facts, the district court didn't discuss the nurses and the prevention of the nurses from seeing Mr. Villegas at all in either the constitutional violation part of the order, the deliberate indifference part of the order, or the qualified immunity part of the order. That's correct. The nurses were not mentioned. That is correct, and it wasn't mentioned that the nurses had all the AED equipment right there at their disposal because that's one of the arguments that the district court used to say, well, they had to be taken to FDORM because they had better medical equipment there. It also didn't mention that the nurses... But my instinctive review of the case from what I've seen so far, and I haven't read every piece of paper in the underlying record yet, is that at least some of those corrections officers, a jury could reasonably find deliberate indifference by preventing the nurses from seeing him, even if not at the very beginning. At the very end, when they were deciding where to take him and where to transport him, were he was completely unresponsive? And not letting the nurse even take the pulse? That to me is different. And it's different than a set of corrections officers who didn't have any medical professionals around them and were doing the best they could under the circumstances. That to me would be a very different case. Can I ask you a question also? I didn't see, or maybe I misread the record, but I didn't see that there was an individualized determination as to each defendant? I'm sorry, Your Honor. Was there an individualized determination as to each defendant? There actually was not, because obviously the way in which a motion for summary judgment can be dealt with is based upon how the defendants present the motion. They presented this as a joint motion, all of them together. They're all represented by the same attorney, except for one of them is represented by another attorney. But our case laws, I think, normally suggest that it needs to be an individualized determination. I understand that, and there is case law that says that, but a motion for summary judgment, I guess if they raise a motion for summary judgment making individualized arguments, it certainly would have to be done. But a district court is not required to pull out of the sky arguments that aren't being made and to deal with them. So that's the reason it wasn't done. So the defendants, except for maybe one, treated themselves as one, that they all fell together or rose together depending on the arguments made? Yes. Well, they all had the same attorney, and that's the way everything was framed. They could have filed individual summary judgment motions. They didn't. There's one other important thing, because if you watch the video, you can see Nurse Spencer has red hair, so you can see her hair, that she's right outside Edeworm, right there. One with the dark hair, then? Dark hair is a nurse that is a fisher. Fisher is the dark-haired lady, but you can see both of them right there. And here's the thing that really shocked the conscience, though we don't need to show shock the conscience in this case, which I can get to. Well, I don't know if I will be able to, but I'll try to. What we have here is instead of allowing the nurses to make a medical assessment right at Edeworm or while he was sitting down, they decided to take the time to take off his spit shield and put on a new spit shield. That is not a medical reason for the delay that was like 30, 45 seconds while they're taking off the one spit shield and putting on another one. Is that when they were wheeling him out into the, I guess from the cell block to the medical facility? Yeah, from the one dorm to the next dorm, yes. But in order to get from one dorm to the other, you had to go outside. You had to go outside. They're in the sun. You can see they're in the sun, and they're slowly wheeling him. It's a shocking video. If you haven't seen the whole thing, it really is shocking because and also you can see the guy's head down and bobbling around, but one of the guards is kind of standing in front of him. It looks like he's trying to block the view. This is an argument that would be made to a jury. He's trying to block the view, but you can see his head is down. His legs are dragging. This is a guy who's dead, who should have been evaluated when he's sitting on the ground in Edeworm. I see my time is up. You can finish answering the question and we'll go on with the question. How do we deal with the video evidence of when your client is taken out of the cell block and I don't know if he's having a reaction to what he had just ingested, and he becomes aggressive and starts fighting and fighting with the officers, and they have to restrain him obviously because they can't, the nurse is not going to be put in that position either and they have to restrain him. So how do we deal with that? Well I mean there is a 20 minute, about a 20 minute, 18-20 minutes depends because it's really hard to see him at some points, but during that period of time obviously there's a struggle going on and they need to get him subdued. You concede that portion of the video? It's our position that there's a 10 minute period of time from when he stops struggling, he stops struggling and then they put on the first spit shield and then they sat him up. You concede at some point that he is biting and being aggressive when they're trying to restrain him in order to get him medical treatment? You can't see that. I mean they testified to that, some of the officers, one of the officers testified that he was trying to bite and spit, yes. But you can't see it. I mean the video is too, you can't see that. That's not the part you see. The part you can see with the greatest clarity is that 10 minutes, that walk to death. When he's sat up, you can see his head down, you can see that this guy is completely out of it. They change the spit shield from one to the next. They move his cuffs from the front to the back. Because keep in mind, he was restrained by his feet and at his hands from the very beginning, put in the front for his hands, so they moved him to the back. And then he sat there for about a minute while the nurses are right outside and their medical bag with the red bag and the AED right there. Right there. All they had to do was come in. And they said, please, all we want to do is come in and we could have done an evaluation as quickly as that. If he wasn't breathing at that point, they could have started CPR at that particular time. Nurse, there, Nurse Fisher, who's not sued, Nurse Fisher said, three to four minutes is death in the context of this type of a situation. We're talking as the Bozeman case said. Counsel, let me ask you something since you're talking about the nurses. Didn't Nurse Spencer, who was an RN, Nurse Fisher's an LPN, Nurse Spencer had more credentials, said it would have been better to examine him at the scene. But she also said what she would have done is taken him to medical, not to FDORM, but to medical, which would have been beyond FDORM and would have taken it more time. Did she not? Wasn't that her testimony? She said she wanted to evaluate him outside of EDORM. But she also said, at some point in time, she did say that as well. But Fisher, I believe, is the RN. And I think- Wait, wait, wait. I'm sorry. I'm sorry. Yeah, I'm sorry. Spencer clearly said that what she would have done and advised is taking him further than they took him. Is that not correct? She would have prolonged the walk to death, as you put it. At one point, she did say that in her deposition. But of course- Well, at any point, did she take that back and say, I misspoke, I wouldn't have done that? That was her opinion as an RN as to what should have been done. They should have had a longer walk. She's not an RN, Your Honor. Can I have your attention? She was not an RN. They should have had a longer walk than they did, according to Nurse Spencer. Is that not correct? The better credentialed nurse was Nurse Fisher. She was the RN. Spencer was not an RN. So the better credentialed nurse, which I think we would take the medical profession- Well, we're on a summary judgment. So if one of the two nurses say, we should do him right now, we should invest, we should look at him right now, three to four minutes his death. If we're looking at this on summary judgment, we're going to take that witness's testimony over someone who says, take him to the hospital- Now, counsel, let me tell you the error in the argument you just made, and it affects many of your arguments. That's great in a medical malpractice case, but this isn't one. The question is deliberate indifference. And if you've got two nurses that have a reasonable, way after the fact, calm reflection statement of what should have been done, then how can you say it's deliberate indifference to have done what one of them says, actually less of an egregious action than what you're arguing was deliberately indifferent? The answer, Your Honor, is- I don't understand how two nurses can say, this is what we should have done. No, this is what we should have done. And you say one of them's position is deliberately indifferent. We didn't say either of theirs was deliberately indifferent. You only- Well, if taking him, counsel, if taking him to the F dorm was deliberately indifferent, how can it be deliberately indifferent if a medical professional says they should have taken him beyond the F dorm? Because another medical professional who was also an employee of the prison says a different thing. You would only accept the testimony of Nurse Spencer if it was uncontradicted, unimpeached, incumbent- Well, it's uncontradicted that that's the opinion of a medical professional. And I don't see how you get deliberate indifference from something that, according to your position, is less egregious than what some non-medical corrections officers did. I just don't understand that. Let me ask you one other thing. I don't believe. There's a handheld camera, and if you look at that, it's got a time counter on it. I thought the time when he quit resisting and they had him cuffed was when they said hands on, legs on. So when he was cuffed from the start. And that was at 7.52 minutes and seconds, according to the counter or whatnot on the camera. And then at 13 minutes and 28 seconds, according to that video, that handheld video and the timestamp on it, I may be misreading it, but that was when the nurses started attending to him at F dorm. I get five minutes and 36 seconds from the hands on, legs on to the nurse treatment at F dorm. But you keep talking about it as seven minutes, and I know I may have misjudged that. But tell me what my mistake is. Wasn't it 7.52 to 13.28? No. First of all, he was cuffed from the start. When he was in the cell, he was handcuffed. He was leg-ironed from the very start. The handcuffs were in front, not in the back. At 7.52, they moved him to the back. He had been non-resistant for about a minute and a half to two minutes before they moved them from the front to the back. Prior to that, they put on the spit shield. That's the first thing they did once he was basically passed out and completely out of it. The first thing they did was that. So it depends on where he was there. You're not quarreling with him putting a spit shield on him, are you? That's not for medical reasons. For a passed out person who's just thrown up in the cell and thrown up in the main room? Are you saying it was deliberately indifference for them to assume that he might not come back and start resisting and spitting again? I mean, I don't— A delay in medical treatment is only appropriate where—for non—okay, failing to treat a serious medical need for non-medical reasons constitutes deliberate indifference. That's a 1985 11th Circuit case in ECOTA versus Prison Health Services, 769 Fed Second 700. That's from this court. It can't be taken in the absolute. If you've got a prisoner who's bleeding but he has a knife in his hand, you can't argue that that statement means that you have to start medically treating him at that point, counsel. You've got some facts you can make a case out of, but it seems to me like the statements you're making go beyond what you have to make, and I'm not sure they're—but I'll check this in the record, what you say, and I appreciate your answering my questions. I do. Your Honor, may I reserve the balance of my time? You have time left. We've taken you way beyond your initial argument. Thank you, Your Honor. Mr. Leach. Okay. Who's going first? Ms. O'Leary? Okay. Ms. O'Leary, on behalf of all of the Appleys except Appley Mashburn, as you all have indicated, the context in which this incident occurred is extremely important. Mr. Villegas mounted a very violent resistance to efforts to restrain him while he was in his cell. Once he was seen as unresponsive, as Judge Lagoa stated, the other correctional officer immediately ran down, they immediately went into the room to try to see what was wrong with him. They had to apply—or one of the officers who showed up on the scene had to apply a sternum rub to rouse him. They roused him, then once they did, he immediately began fighting and struggling with the officers. What a sternum rub is? Because it was unclear to me— Was there pressure on the sternum that apparently helps arouse a person who appears to be passed out or— They're not on appeal. There's no argument that there was excessive force. So I think it's taken as a given that the force that the officers had to use to restrain him in the cell was not constitutionally excessive. Right. I accept that. Now— I simply bring this up because this is the context in which they were operating. You have to take the context into account. Yes. No doubt about it. Here's my concern. After he is completely restrained, after he stops resisting, and after he is completely unresponsive, the officers do not let the nurses even do a quick checkup on him. And the district court doesn't mention that at all in its analysis of deliberate indifference. That is a huge gaping hole for me in this case. If you had a situation—I speak only for myself—if you had a situation where you had corrections officers by themselves in this sort of a situation and were trying to figure out what to do, I could completely understand that at most it amounts to negligence. But when you've got two nurses outside who are trying to access him twice and are twice turned away to not even run a pulse and a quick 30-second check, tell me why a jury could not find that that's deliberate indifference in denying—not just delaying medical care, which goes to Judge Carnes' point, but the denial of medical care. They had two medical professionals ready to go with the defibrillator. They wanted to see him while he was in the cell, when they were starting to take him out of the cell, and the officers do not let the nurses do a single thing. Tell me why a jury could not find, for at least some officers, that that is deliberate indifference. Well, I think because, again, you have to look at the big picture and you have to look at the safety of the officers, you have to look at the safety of— At the time I'm talking about, I'm giving you the first 10 or 15 or 20 minutes, whatever it is. I'm giving you all that. Right. And we saw the video. I mean, this is not a situation where there are no other inmates. The other inmate who was in the cell with him had already been taken out of the cell, so it wasn't a situation where you had a couple people in the cell that you had to still remove. You don't have any of that. That person is taken care of, so that's not an issue. And there's literally no one else because there's no one else. It's not even like it's happening in the lunch area where you have a lot of inmates around and there's a situation and you need to be careful and handle the situation very delicately. That's not at all. There's a lot of corrections officers in the video, and it's Mr. Villegas. The nurse is not allowed to go see him after he's been restrained. He's put in the wheelchair, not allowed to go see him, and then they keep moving. So what exactly do—what are the officers fearful of at that point? Well, at that point, I think they're fearful of what he might do to the nurse who is then—  He's in a wheelchair. Literally, he's handcuffed and he's leg restrained. So how is it possible if I go over and I go do his pulse, how is that a problem if he's restrained and he's in a wheelchair? I think at that point, I mean, the initial plan was to take him over to the medical facility so he could be evaluated where there was more equipment, there was just a better environment for evaluating him. That may be a proper argument if the nurse hadn't been in the vicinity and she asked to see him. Well, but again, if she could see him, she had limited equipment with her, and if he did have some additional problems, she wouldn't have what she needed to try to treat him there. And so that's why they— You know that. Well, if you rely on a medical professional to make an assessment on the scene, right? But they didn't allow that assessment to be made. Then we get to what Judge Karn was saying about how the one nurse said we should have taken him over to the actual medical facility instead of— But you're asking those nurses that question. That's about the delay issue. But this is a denial issue, right? I mean, they weren't even allowed— You can say all sorts of things after the fact about what you would have done, but they weren't allowed to evaluate him. Had they been allowed to evaluate him, this would be a very different case. If one of the nurses had been allowed to evaluate him and said, take him here instead of there, or do this instead of that. Right. Even if she had evaluated him and said, you know, he's fine, and just take him over there, and he ended up having a cardiac arrest, at that point it's still negligence. It's non-deliberate indifference to medical treatment. Right. But I think back to the context of what had occurred, what actually Nurse Fisher herself had observed. I mean, she testified in her deposition about how he was resisting, how he was grunting and growling. He had superhuman strength, the strength of a grizzly bear. I think they're still riding off of all of that. At the beginning, but the nurses still wanted to evaluate him. I know, because that's what health care professionals do. That's their duty, their job. In a lot of different areas, our constitutional cases with excessive force, medical care, et cetera, draw some sort of a line between individuals who are resisting, posing a threat, creating a volatile environment, and those who are passive, unrestrained, unconscious. And there are things that officers are allowed to do to the first category of people, or not do, that they're not allowed to do to the second category of people. And it just seems to me that a jury could reasonably find that by denying the nurses the opportunity to see him when they had requested the chance to do so twice, a jury could say that goes beyond negligence, it goes beyond gross negligence, that's deliberate indifference. And at summary judgment, we're not deciding whether or not the evidence definitely showed deliberate indifference. It's whether a reasonable fact finder could do so. So I don't know, that's just my perspective. And the fact that the district court didn't discuss the prevention of the nurses from seeing him in the constitutional and qualified immunity analysis is sort of a red flag for me. You know, and the thing is that we've had cases where you have, and I get that sometimes a nurse can't go into the cell block because you have a situation where maybe there's been a fight. And so now you have to restrain and contain the situation so the nurse can't go into the cell. And so then the person has to be taken out and then you make the evaluation or they decide, you know, let's move him quickly. But here, there's that situation where he is restrained. I mean, I understand not allowing her to go into the cell block because he was, he had, when he came to, he was aggressive and it's a small, the cell is very small so you can't just have her go in there and it'd be dangerous for the nurse, so. But it is a concern. Was it raised with the district court and the district court just did not address it? You know, I don't think, right now I can't recall if that specifically was raised. But in any event, if you look at the delay, if you look at it as a denial of care, the time of the delay that he was denied care is only the time it took to wheel him over to the room. So then is that a sufficient length of time to constitute gross negligence? And you know, we of course would argue that it doesn't. I mean, because again, they were trying to get him to what they perceived to be a proper place to get him medically evaluated in a more thorough manner. So it wasn't simply, oh no, you can't. It was not yet, you just can't yet. We want to move him to a better place where it's more secure, where he, if he acts up again they had holding cells near him, where his HIPAA information, you know, I know that's inconsequential in a lot of this, but where that would be protected. So it wasn't, it wasn't a, oh, we're not going to evaluate, it's hold on, let's just move to a better place to evaluate him. Council, what medical equipment was at the F-dorm that wasn't at the, at hand, either on the wheelchair or the E-dorm? Well, apparently they had oxygen. They had other devices. I know they had a bag with them in the E-dorm, but they had tables. They just had more, a more structured environment where they could assess him. When you say a bag, what do you mean at the E-dorm? Well, you could see in the video, in the wheelchair, she had like a little, a medical bag. Is that the defibrillator? I'm sorry? Was it a defibrillator? I believe that there was testimony that it was a defibrillator, but if you, you want to get to the defibrillator issue, I don't know if you've watched all the videos all the way through when they're actually, paramedics are trying to revive him. They had an AED device and it kept saying, don't shock. So I don't know if a defibrillator really would have helped at whatever point in time because whatever his problem was, at least then. In the red bag, was it more than defibrillator? Did it also have like the pen where you, it's like an adrenaline pen to help resuscitate someone? You know, I'm not sure. I would have to check the record and I could, I could do that and supplement with a letter to the court if you'd like. That's okay. We'll, we'll look, we'll look at the record ourselves. All of us have seen different parts of it, but not every one of us, I think, at least myself, hasn't read every single page. Yeah. It's quite lengthy, but I realize I'm over my time. Thank you very much. That's okay. We took you over your time. Thank you very much. Thank you. Thank you, Your Honors. May it please the Court, I only represent Appellee Mashburn in this case. He was the Assistant Warden of the Mental Health Facility at Lake Correctional Institution during the course of these events. And the only, I guess, theories of liability, I will say, that the plaintiff has brought against Mr. Mashburn are theories of supervisory liability. And, of course, what this Court has said is that standard in the Section 1983 context is extremely rigorous. And part of that, part of establishing a liability under Section 1983 against the supervisors showing a causal connection between the actions of the supervisor, the supervisor himself or herself, and the actions of the subordinate. And what the plaintiff has, excuse me, the plaintiff has proceeded under two theories to try to make that causal connection here. And the first one is a failure to stop theory. And this Court outlined the elements to that theory in the Keating v. City of Miami case. And in its formulation of the elements in that case, something that was key to establishing that causal connection in the supervisory liability context was that the supervisor had knowledge that there was a constitutional violation being committed and then failed to exercise his or her authority to stop their subordinates from engaging in that unconstitutional behavior. Keating, it was a situation where the superiors actually instructed their subordinates to use nonlethal force to disperse peaceful protesters, witness this happening, and then fail to stop the subordinates from doing so. In this situation, it is why I will say there is no genuine disputed fact that Mr. Mashburn was ever in a position to appreciate that Mr. Villegas had any type of serious medical need that the subordinate officers were deliberately indifferent to. And that lack of knowledge here is key, and it's what makes reversal, as to Mr. Mashburn at least, inappropriate in this case. My friends on the other side, they point to two pieces in the record to try to bridge that gap, to try to say that there is a material fact issue, and we say that it's not genuine. The first one is testimony from Mr. Foster. And Mr. Foster said that one of the correctional officers on the scene, it's not specified who, and he's kind of equivocal about this later on in this deposition, but one of the officers on the scene relayed to either Mr. Lee, Mr. Dasano, or Mr. Mashburn that Mr. Villegas was unresponsive. Now, that doesn't create a genuine disputed issue of fact because it would require a fact finder to speculate that it was Mr. Mashburn that was the one that was told that Mr. Villegas was unresponsive. The other point that the plaintiff relies on is the video. And it's not specific what video, what aspect of the video. There's no timestamps in the briefing that the plaintiffs point to, but what we submit to the court, and I know the court has reviewed all the videos and looked through them, both the e-dorm video that's kind of taken from up above, and also the handheld video shows that Mr. Mashburn was simply not in a position to where he had a clear, unobstructed view of Mr. Villegas from any point in time, either from the beginning of the struggle or to the point where he was restrained. Help me try to remember, where is he, if you're looking at the video straight ahead, where is he situated in terms of his location in comparison to the cell? Well, what I would say, too, is when the court looks at the record, Mr. Mashburn's deposition towards the end, plaintiff's counsel kind of walks him through where he is. He first appears on the video during a portion of the struggle, and he's kind of about six to eight feet away, kind of near the next cell. I think, based on the discussion that we've been having today, the court is most kind of dialed in to, right, what happens after he's restrained? What happens? I just, from my recollection when I watched the video again, is there anything, is he dressed in the same? He's not, Your Honor. He has, he just has kind of a white shirt on and a tie, and he's got kind of slacks and business kind of shoes. He has been referred to in the depositions as a non-uniformed officer. In the handheld video, he's not even on the screen at the point in time that Mr. Villegas has been restrained. And you can see kind of in some of the other videos, particularly the overhead video, he's kind of, at one point he's off to the stairwell, at one point he's off kind of towards where the benches are. But when, before it starts, before there's an alert, okay, where would he have been situated? He would have been in the mental health dorm. And what Mr. Bashburn said in terms of where that was situated, it was close enough to E-Dorm that he saw that there was activity. He saw there were a lot of officers going to E-Dorm. And what he said was, in his experience, he's been a correctional officer for over 20 years, things in a prison obviously can go bad very fast. And he wanted to be on scene in case that happens. But what the video reveals and what the video shows is that he was simply not in a position to appreciate that there was a serious need that he was being, that, excuse me, his officers, subordinate officers, were being deliberately indifferent to. I know I'm over my time. I, if I... How long was he, how long was he on the scene? You know, Your Honor, I think that he was on, he was in E-Dorm, kind of towards the middle, I guess, of the use of force once Mr. Villegas had been taken out of his cell. And it's hard to answer that question. I'm not trying to not answer that question just because at points in time he walks off, he's walked off of the video, he's not there on certain points in time. So I don't know exactly how long he was intermittently is the best that I, that I can, can answer that. Okay. As long as the record shows, that's what it shows. And Your Honor, I think that is what the videos will show. I wanted to say one quick thing, if the Court would permit me, I apologize that I'm over my time. If the Court would permit me to make one point on the customer practice claim. Thirty seconds. Thirty seconds. What Mr. Mashburn said was if Mr. Villegas had been in medical distress, he would have been seen on site. That was what he testified to. And I think that that shows that any alleged customer practice of Mr. Mashburn in terms of always transmitting inmates to a medical treatment room, that wasn't his practice. And such practice is only supported by the isolated instance of Mr. Villegas. And what this Court says is that that's not sufficient to bridge that causal connection to meet that supervisory liability standard. And what, frankly, what the plaintiffs are asking for, what we submit they are asking for, is a kind of not just vicarious liability standard, but a strict vicarious liability standard based on mere presence alone. And we don't think the case law supports that. And therefore, the judgment as to Mr. Mashburn on these supervisory liability claims we submit should be affirmed. Thank you. All right. Thank you very much. Let me take the last thing first, if I could, Your Honor. Mr. Assistant Warden Mashburn is in the white shirt, and he's leaning on cell 119, which is the one right next to Mr. Jose Villegas' cell. He's there leaning. And you can see him. He's there pretty early, and he's there until they get all the way to FDORM. So he was there throughout the period of time when this gentleman is basically unconscious, completely out of it, knowing that their nurse is right there. Another thing, if you take a look, because we talked about the red bag. So the theory of liability as to him is twofold, right? What are the two theories? Yes. First, he's an active participant because he's there, just like all the other COs, sergeants, you know, up the chain that were there. Each of them independently has an obligation when they observe somebody in medical distress to take steps. Every one of them. Every one of them does. That's in their own policies. If you take a look at the... But if he... But if... I guess I'm trying to differentiate, in my mind, the difference between your claim for and supervisory liability if he was there. Right. It's not a supervisory... What's the... Well, the district court thought there was a supervisory liability claim as to Mr. Mashburn because it addressed it in that form. Right. It was... Is the district court mistaken, or are you just suing Mr. Mashburn in the same way you're suing all the other officers who were there on the scene? I think the count was labeled supervisory liability, but the allegations are the same. Because if you take a look at that count, in fact, she dropped a footnote saying that this was a shotgun pleading because it included everything in it, but she said that given the disposition of the rest, she wasn't worried about it and was going to consider it, so... So you're not seeking supervisory liability theories against Mr. Mashburn? No. He's... The theories against him are he's a participant in the process, one. Two, it's a custom or practice because all the CEOs said, despite what their own specific policies say, say, oh, well, no, we'd never do an evaluation of somebody there in the dorm. And we always take them off scene, which... Custom and policy claim is a claim against the entity, right? Well, yeah. So that would be in his capacity as a... Not an individual capacity at that point. So, yes, that's correct. But, yeah, I mean, you're asserting a custom and policy claim... Custom and practice, yeah. Custom... Right. But an official capacity claim, the Supreme Court has said in numerous cases, is a claim against the entity in practice. So who are you trying to get at through Mr. Mashburn if you're suing him in his official capacity? So, for example, if you have a county that operates a jail, and the person in charge of the jail is the sheriff, and you think that the sheriff's policies for whatever are constitutionally inadequate and violate the Constitution, you sue the sheriff in his official capacity as a way to get to the county under a municipal liability theory under Monell. And you have to show custom practice policy, et cetera, et cetera. That looks to be what they're alleging here. That does seem to be what's being alleged. So there's this custom and practice one, which maybe is half-baked, but there's also the individual claim just like all of the other ones. I understand the individual one. I understand that because he was there. So I understand it. I don't know whether you get there on him, but I understand the theory because he was there. So you're suing him as a participant. Yeah. I don't understand the other claim. I just want to confirm. So my understanding is, if you look at the pleading, the title of the count against Mr. Mashborn is as a supervisory liability, right? I'm going to take a look right now so I can follow along. And it's not a Monell claim? It is not a Monell claim, no. That is, it's not. It's labeled violation of civil rights supervisory liability is what it's called, but then as you read through it, it incorporates the allegations as it relates, which is why she said it was a shotgun pleading, and incorporates the allegations as it relates to serious medical and psychiatric needs, deliberate indifference, and excessive force because of his presence. Essentially, I guess you might call it a failure to intervene claim. It's a second amended complaint, right? What's that? That's count four. It's second amended complaint. Yes. That is correct. That is correct. But I think the real bottom line on the entire analysis about the supervisors is we have a code that says appropriate medical treatment shall be provided immediately. That's what it says. And they were saying, each of the officers were saying, oh, no, well, we don't follow that. We don't do it immediately. It's our practice. If there's use of force, we take them to, we take them off scene. But you don't have a Monell claim? I understand that. If that falls, it falls. I mean, it's the, I guess the claim related to the supervisory personnel is more for their for any type of Monell thing. But the heart of it, I guess, was the idea that you do have Florida administrative codes that says appropriate medical treatment shall be provided immediately. And they didn't do that. Their own post orders say the same thing. And it even says in the post orders that you shall contact them immediately. And then during the time frame pending the arrival of assistance. This is in the post orders. It says you shall immediately secure the area. At this point, provide first responder assistance for medical issues. That's what their own post orders say they're supposed to do. In this case, they called for the nurses. The nurses were there. And then they told them to leave and wouldn't let them see him. As Judge Jordan has pointed out, when specifically asked, now, one last thing, Your Honor. We've taken you way over your time. So I'll give you 30 seconds to wrap up. One last thing. Thank you, Your Honor. I did want, because Judge Carnes had mentioned this, so I wanted to close the circle with respect to that. Judge, excuse me, Nurse Spencer, who's an LPN, not an RN, she unequivocally stated that she would have been, if she had been summoned to assess Villegas, she should have been summoned to assess Villegas in the E-dorm. And she stated, quote, time is of the essence when you're dealing with an unresponsive inmate with a medical emergency. And it would have only taken her a few seconds to have done an assessment to determine whether Villegas was breathing or whether he had a pulse. That's what Nurse Spencer said. Nurse Fischer said, I'm going to inform you of this step. Counselor, before you leave, before you leave Spencer, but she also said that if she'd done that, she would have favored taking him to the medical treatment facility, not the treatment room in F-dorm. Have I got that? I know I made a mistake about Spencer. She is the LPN. You're right. But did she not say that she would have preferred, favored, recommended taking him to the medical treatment facility? Because if you see what the F-dorm room looked like, it looked like a closet. I'm sorry, Counselor, you're arguing with a premise I haven't laid out. I'm just wanting to know, is that what she said? She did say that after saying that she wished she did. She testified. She did testify that after first testifying that she wished that time was of the essence and she wished she'd been able to assess him in the E-dorm before he was even moved. So yes, she said both things. That's true. Yeah, but did she say, did she say, Counselor, and I didn't see this, breathes or anywhere else or the order, did she say if she had been allowed to assess him, she would have recommended treatment on the spot as opposed to taking him to the E-dorm or the medical treatment facility? I don't think she could answer that because they don't know what they would have found ten minutes earlier. So your answer, your answer to my, your answer to my question is simply no, right? She didn't say that. She did not. No, but if they'd done an assessment ten minutes earlier, his condition might have been completely different. His pulse, he might have had a pulse and he might have been breathing at that point in time. But by taking this delay and denial, that was, that opportunity was lost. And if I can make just in conclusion, Your Honor, in conclusion. Mr. Leach, I gave you one chance and now you want chance number two. Okay. I respectfully request the Court reverse this summary judgment. Thank you very much. Thank you all for your arguments. We are in recess until tomorrow morning.